**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**
Case No.: _____

**DANIEL SANTANA,**

     Plaintiff,

v.

**GOODLEAP, LLC,**

     Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Daniel Santana sues Defendant GoodLeap, LLC and alleges:

## INTRODUCTION

1.     Daniel Santana is a Hispanic Collections Specialist of Puerto Rican descent who works for GoodLeap, LLC from his home in Lee County, Florida. Until April 2025, Santana earned roughly $1,500 per month in commission by collecting past-due consumer-finance accounts. In or around April 2025, GoodLeap changed its call-routing system so that inbound calls, which are the calls most likely to produce a collection, flowed almost exclusively to non-Hispanic, English-only agents. Santana's monthly commission fell to roughly $300. GoodLeap's

management explained the shift by reference to a stereotype: that English speakers are "better negotiators." When Santana joined in written complaints to Human Resources, GoodLeap's managers tried to identify him as the anonymous complainant rather than address the underlying inequity. GoodLeap also requires Santana to perform substantial unpaid pre-shift work booting, logging in to, and troubleshooting the systems he needs before he can take his first call of the day. Santana brings this action under 42 U.S.C. § 1981, the Florida Civil Rights Act, Fla. Stat. § 760.10, and the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq.

## JURISDICTION AND VENUE

2.     This Court has subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 because the claims arise under 42 U.S.C. § 1981 and the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. The FLSA confers a private right of action under 29 U.S.C. § 216(b).

3.     This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same common nucleus of operative fact as the federal claims.

4.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here. Plaintiff performs his work for Defendant from his residence in Lee County, Florida, which lies within the Fort Myers Division of the Middle District of Florida.

5.     Plaintiff has satisfied all conditions precedent to bringing his Florida Civil Rights Act claims. On October 14, 2025, Plaintiff dual-filed a Charge of Discrimination with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations. More than 180 days have elapsed since that filing without a determination by the Commission. Under Fla. Stat. § 760.11(8), Plaintiff is entitled to proceed as if the Commission had issued a reasonable-cause determination. Plaintiff's federal claims under 42 U.S.C. § 1981 and the Fair Labor Standards Act are not subject to any administrative-exhaustion requirement.

## PARTIES

6.     Plaintiff Daniel Santana is an adult individual who resides in Lee County, Florida. Mr. Santana was born in Puerto Rico and identifies as Hispanic of Puerto Rican descent. At all times relevant to this action, Mr. Santana has been employed by Defendant as a Collections Specialist assigned to its Bilingual Team.

7.     Defendant GoodLeap, LLC is a California limited-liability company with its principal place of business at 8781 Sierra College Boulevard, Roseville, California 95661. GoodLeap employs more than fifteen employees and is an "employer" within the meaning of 42 U.S.C. § 1981 and Fla. Stat. § 760.02(7). GoodLeap is also an "employer" within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203(d), and is engaged in commerce and in an enterprise engaged in commerce within the meaning of 29 U.S.C. § 203(s)(1), with an annual gross

volume of sales or business done of not less than $500,000. GoodLeap does business throughout the United States, including in Lee County, Florida, where Mr. Santana performs his work remotely for the company.

## FACTUAL ALLEGATIONS

### *Mr. Santana's Employment and GoodLeap's Two Collections Teams*

8.      GoodLeap finances residential solar installations and home-improvement projects for consumers throughout the United States. Its collections department is responsible for recovering past-due balances on consumer-finance accounts. Collections specialists place outbound calls to delinquent customers and receive inbound calls from customers who contact GoodLeap to make payments.

9.      GoodLeap hired Mr. Santana on May 13, 2024 as a Collections Specialist. GoodLeap assigned him to its Bilingual Team, which handles calls in both English and Spanish.

10.     GoodLeap also maintains an English-only team, whose members handle calls only in English. When an English-only agent receives a Spanish-speaking customer, the agent transfers the call to the Bilingual Team.

11.     The Bilingual Team is predominantly composed of Hispanic employees of Puerto Rican and Latin American descent. The English-only team is predominantly composed of non-Hispanic employees.

12.     GoodLeap pays collections specialists an hourly base wage of $18.00 plus monthly commission. Commission is calculated on a tiered scale tied to the dollar value of past-due balances collected, divided by hours worked. Inbound calls produce a disproportionate share of commissions because an inbound caller has, by definition, initiated contact with GoodLeap and intends to make a payment.

***The Prior Call-Routing Practice***

13.     Before April 2025, GoodLeap routed inbound calls to individual agents based on each agent's individual outbound performance, without regard to team assignment. Under that system, Mr. Santana typically earned approximately $1,500 per month in commission.

***The April 2025 Call-Routing Change***

14.     In or around April 2025, GoodLeap altered its call-routing practice. From that time forward, inbound calls were routed almost exclusively to members of the English-only team. The Bilingual Team was left to handle the rare Spanish-language inbound call and to make outbound calls to customers who had no immediate intention of paying.

15.     The call-routing change dramatically reduced commission earnings on the Bilingual Team. Mr. Santana's monthly commission fell from approximately $1,500 to approximately $300, a decline of roughly eighty percent.

16.    One day in or around the summer of 2025 provides a representative illustration. On that day, Mr. Santana placed 147 outbound calls and collected approximately $6,000 in past-due balances. He received only seven inbound calls, six of which were dead calls. On that same day, Maria Folsom, an agent on the English-only team, placed only three outbound calls, received twenty-three inbound calls, and collected $6,267. Ms. Folsom, a non-Hispanic employee, collected roughly the same dollar amount as Mr. Santana while performing a fraction of the outbound work.

***Management's Acknowledged Preference for English-Speaking Agents***

17.    GoodLeap's management has made the basis for the call-routing change explicit. A member of the Bilingual Team whose brother trains for GoodLeap's collections department has reported that management believes English-speaking agents are "better negotiators" than their Hispanic, Spanish-speaking counterparts. That stereotype is consistent with the routing practice and with the justification GoodLeap has offered for it.

***The Salesforce System Issue Compounded the Disparity***

18.    In or around June 2025, GoodLeap's Salesforce customer-information platform began failing to auto-generate customer records in time for an agent to take an incoming call. By the time a Bilingual Team agent could access the customer's record, the customer frequently hung up. Mr. Santana and his colleagues reported

the problem to GoodLeap's Information Technology department. An IT technician, Nicolae Catalin, told the team that IT could not resolve the issue. Mr. Santana's supervisor, Yesenia Arzate, directed the Bilingual Team to "try our best" and keep taking as many calls as possible. The Bilingual Team has been forced to troubleshoot the problem individually, clearing cache, restarting computers, and running Dell updates, none of which resolves the issue.

***Mr. Santana's Protected Activity***

19.     On August 21, 2025, Mr. Santana and other members of the Bilingual Team sent a written collective complaint to GoodLeap's Human Resources department. The complaint documented the call-routing disparity, the decline in commission earnings, and the disparate impact of the routing practice on Hispanic, Puerto Rican, and Latin American-born bilingual agents. The complaint identified the practice as a potential violation of Title VII and analogous state law, and requested a prompt response and corrective action.

20.     GoodLeap did not respond.

21.     On September 4, 2025, Mr. Santana and his bilingual colleagues sent a second written complaint. The second complaint reiterated the prior concerns, noted GoodLeap's failure to respond, and advised that the complainants would seek external remedies if GoodLeap did not respond substantively within five business days.

22.    GoodLeap again did not respond substantively.

### *GoodLeap's Identification of Mr. Santana as the Complainant*

23.    At a one-on-one meeting between Mr. Santana and Yesenia Arzate that followed the September complaint, Ms. Arzate told Mr. Santana that her own manager, Kaylyn, had asked Ms. Arzate whether Mr. Santana was the person who had sent the anonymous HR complaints. Ms. Arzate told Mr. Santana that she had answered she did not know.

24.    This disclosure established that GoodLeap's management was aware of Mr. Santana's protected activity and was attempting to identify him as the source of the anonymous complaints.

25.    Mr. Santana responded by telling Ms. Arzate that he feared retaliation for having raised the concerns.

### *Unpaid Pre-Shift Boot-Up and Log-In Time*

26.    GoodLeap requires Mr. Santana, as a condition of his collections work, to be logged in and ready to take his first call at the beginning of each scheduled shift. To reach that state, Mr. Santana must power on his GoodLeap-issued computer, wait for Windows and security updates to install, launch and log in to multiple GoodLeap systems, including the softphone application and Salesforce, and verify that each system is functioning before his shift begins.

27.    The boot-up, log-in, and troubleshooting work described in the preceding paragraph is integral and indispensable to Mr. Santana's principal job duties as a collections agent. Without completing these tasks, Mr. Santana cannot place or receive calls, access customer records, or perform any of the productive work for which GoodLeap employs him.

28.    This pre-shift work regularly consumes not less than fifteen to thirty minutes per workday. Because of the Salesforce instability described above, the pre-shift troubleshooting burden has increased rather than decreased.

29.    GoodLeap does not compensate Mr. Santana for this pre-shift work. GoodLeap's timekeeping system records Mr. Santana's compensable hours beginning when he logs into the telephony platform, which occurs only after the uncompensated boot-up and log-in activities are complete. When the pre-shift work is included, Mr. Santana routinely works in excess of forty hours in a workweek and is entitled to overtime compensation at one and one-half times his regular rate for the hours worked in excess of forty. GoodLeap has not paid Mr. Santana that overtime compensation. GoodLeap either knew or showed reckless disregard for whether its conduct was prohibited by the FLSA.

***Continuing Injury***

30.    Mr. Santana remains employed by GoodLeap as a Collections Specialist on the Bilingual Team. The discriminatory call-routing practice remains

in place. Mr. Santana continues to earn approximately $300 per month in commission, roughly twenty percent of what he earned before the routing change. He has suffered, and continues to suffer, lost wages, lost commission, unpaid overtime wages, emotional distress, humiliation, and damage to his career prospects.

31.    At all relevant times, Mr. Santana has performed the essential functions of his position at a level that meets or exceeds GoodLeap's legitimate expectations.

**COUNT I**
**Race and Ethnicity Discrimination in Violation of 42 U.S.C. § 1981**
**(against GoodLeap, LLC)**

32.    Plaintiff reincorporates the allegations in paragraphs 1 through 18, 30, and 31 as though fully set forth herein.

33.    Section 1981 guarantees all persons within the jurisdiction of the United States the same right to make and enforce contracts as is enjoyed by white citizens. The statute defines "make and enforce contracts" to include the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(a), (b). Section 1981 prohibits intentional discrimination based on race, ancestry, and ethnic characteristics.

34.    Mr. Santana is Hispanic and of Puerto Rican descent and is therefore a member of a class protected by § 1981.

35. Mr. Santana's employment relationship with GoodLeap is a contract within the meaning of § 1981.

36. GoodLeap altered the terms and conditions of Mr. Santana's contractual relationship by restructuring its call routing in a manner that systematically deprived him and his predominantly Hispanic colleagues of the inbound calls necessary to earn commission. The restructuring reduced Mr. Santana's compensation by approximately eighty percent. Non-Hispanic employees performing the same role on the English-only team were not subjected to the same deprivation; they received the inbound calls redirected away from the Bilingual Team.

37. GoodLeap's conduct was intentional and motivated, at least in part, by Mr. Santana's race and ethnicity. Management attributed superior negotiating ability to English-speaking employees and routed the income-producing inbound calls to them accordingly. That stereotype is direct evidence of discriminatory motive.

38. Comparator evidence reinforces the inference of discrimination. Maria Folsom, a non-Hispanic agent on the English-only team, received approximately three times the inbound volume of Mr. Santana on a representative day despite placing only a small fraction of the outbound calls.

39. As a direct and proximate result of GoodLeap's unlawful conduct, Mr. Santana has suffered lost wages, lost commission, emotional distress, humiliation,

and damage to his career. GoodLeap's conduct was undertaken with malice or reckless indifference to Mr. Santana's federally protected rights, warranting an award of punitive damages.

**COUNT II**
**Retaliation in Violation of 42 U.S.C. § 1981**
**(against GoodLeap, LLC)**

40.    Plaintiff reincorporates the allegations in paragraphs 1 through 25, 30, and 31 as though fully set forth herein.

41.    Section 1981 prohibits retaliation against an employee who opposes practices made unlawful by that statute.

42.    Mr. Santana engaged in protected activity when he joined his bilingual colleagues in sending the August 21, 2025 and September 4, 2025 written complaints to GoodLeap's Human Resources department. Those complaints opposed practices that Mr. Santana reasonably and in good faith believed to violate § 1981 and Title VII.

43.    GoodLeap's management became aware of the complaints and set about to identify the employees who had sent them. Through Kaylyn, the manager of Mr. Santana's direct supervisor, GoodLeap specifically inquired whether Mr. Santana was the author of the anonymous complaints.

44.    GoodLeap's effort to identify Mr. Santana as the source of the anonymous Human Resources complaints was itself a materially adverse action. A

reasonable worker in Mr. Santana's position would be dissuaded from making or supporting a charge of discrimination on learning that management had singled him out and was seeking to identify him as the author of confidential, anonymous opposition to company practice. The intended and foreseeable effect of the inquiry was to chill Mr. Santana's continued exercise of his statutory rights.

45. A causal connection exists between Mr. Santana's protected activity and GoodLeap's identification effort. Management's inquiry followed the complaints within a matter of weeks and was expressly directed at identifying the author of those complaints.

46. As a direct and proximate result of GoodLeap's retaliation, Mr. Santana has suffered emotional distress, humiliation, fear of further retaliation, and damage to his career. GoodLeap's conduct was willful and warrants an award of punitive damages.

### COUNT III
**National Origin Discrimination in Violation of the Florida Civil Rights Act,
Fla. Stat. § 760.10
(against GoodLeap, LLC)**

47. Plaintiff reincorporates the allegations in paragraphs 1 through 18, 30, and 31 as though fully set forth herein.

48. The Florida Civil Rights Act makes it an unlawful employment practice for an employer to discriminate against an employee with respect to compensation,

terms, conditions, or privileges of employment because of the employee's national origin. Fla. Stat. § 760.10(1)(a).

49.    Mr. Santana's national origin is Puerto Rican.

50.    GoodLeap discriminated against Mr. Santana with respect to the compensation, terms, conditions, and privileges of his employment by routing income-producing inbound calls away from the predominantly Hispanic, predominantly Puerto Rican and Latin American-born Bilingual Team and toward the predominantly non-Hispanic English-only team. Mr. Santana was subjected to this treatment because of his Puerto Rican national origin.

51.    GoodLeap's conduct was intentional. Management's acknowledged preference for English speakers as "better negotiators," directed toward a workforce in which national origin differentiated the two teams, reflects national-origin animus.

52.    As a direct and proximate result of GoodLeap's unlawful conduct, Mr. Santana has suffered the injuries alleged in paragraph 30. Mr. Santana is entitled to the relief available under Fla. Stat. § 760.11(5), including compensatory damages, punitive damages up to $100,000, and reasonable attorney's fees and costs.

**COUNT IV**
**Retaliation in Violation of the Florida Civil Rights Act, Fla. Stat. § 760.10**
**(against GoodLeap, LLC)**

53.    Plaintiff reincorporates the allegations in paragraphs 1 through 25, 30, and 31 as though fully set forth herein.

54.    Section 760.10(7), Florida Statutes, prohibits retaliation against an employee for opposing any practice that is an unlawful employment practice under the Act.

55.    Mr. Santana engaged in protected activity by joining his bilingual colleagues in the August 21 and September 4, 2025 written complaints to Human Resources opposing the discriminatory call-routing practice.

56.    GoodLeap became aware of Mr. Santana's protected activity and set about to identify him as the anonymous author, through Kaylyn's inquiry to Ms. Arzate.

57.    GoodLeap's effort to identify Mr. Santana as the anonymous complainant was a materially adverse action that would dissuade a reasonable worker from making or supporting a charge of discrimination.

58.    A causal connection exists between Mr. Santana's protected activity and GoodLeap's identification effort.

59.    As a direct and proximate result of GoodLeap's retaliation, Mr. Santana has suffered the injuries alleged in paragraph 30. Mr. Santana is entitled to the relief available under Fla. Stat. § 760.11(5).

## COUNT V
### Unpaid Overtime in Violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. (against GoodLeap, LLC)

60.    Plaintiff reincorporates the allegations in paragraphs 1 through 18 and 26 through 31 as though fully set forth herein.

61.    The Fair Labor Standards Act requires an employer to pay its non-exempt employees overtime compensation at not less than one and one-half times the regular rate of pay for all hours worked in excess of forty in a workweek. 29 U.S.C. § 207(a)(1).

62.    At all times relevant to this action, Mr. Santana has been a non-exempt employee of GoodLeap within the meaning of the FLSA. GoodLeap has been an "employer" engaged in commerce and in an enterprise engaged in commerce within the meaning of 29 U.S.C. §§ 203(d) and 203(s)(1).

63.    The pre-shift boot-up, log-in, and troubleshooting activities described above constitute "work" within the meaning of the FLSA. Those activities are integral and indispensable to Mr. Santana's principal job duties as a collections agent and are required by GoodLeap as a condition of Mr. Santana's employment.

64.    GoodLeap has failed to compensate Mr. Santana for the pre-shift boot-up, log-in, and troubleshooting time. When that time is included, Mr. Santana routinely works more than forty hours in a workweek without receiving overtime

compensation at one and one-half times his regular rate for hours worked in excess of forty.

65.    GoodLeap's violation of the FLSA has been willful within the meaning of 29 U.S.C. § 255(a). GoodLeap knew or showed reckless disregard for whether its pay practices complied with the FLSA. GoodLeap's timekeeping system is designed so that the clock does not begin until the uncompensated pre-shift work is complete, a design choice reflecting at least reckless indifference to the FLSA's requirements.

66.    As a direct and proximate result of GoodLeap's unlawful conduct, Mr. Santana has suffered lost overtime wages for all weeks within the applicable limitations period.

67.    Mr. Santana is entitled to recover his unpaid overtime compensation, an equal amount as liquidated damages, reasonable attorney's fees, and costs of this action under 29 U.S.C. § 216(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Daniel Santana respectfully requests that this Court enter judgment in his favor and against Defendant GoodLeap, LLC, awarding the following relief:

a.    Compensatory damages in an amount to be determined at trial, including back pay, lost commission, lost benefits, and damages for emotional distress and humiliation;

b.    Unpaid overtime compensation under the Fair Labor Standards Act for all weeks within the applicable limitations period, together with an equal amount as liquidated damages under 29 U.S.C. § 216(b);

c.    Punitive damages under 42 U.S.C. § 1981 and Fla. Stat. § 760.11(5);

d.    Pre-judgment and post-judgment interest at the maximum rate permitted by law;

e.    A declaration that GoodLeap's call-routing practice violates 42 U.S.C. § 1981 and Fla. Stat. § 760.10, and that GoodLeap's pre-shift pay practices violate the Fair Labor Standards Act;

f.    Injunctive relief requiring GoodLeap to discontinue its discriminatory call-routing practice, restore the prior merit-based routing system or an equivalent nondiscriminatory structure, pay retroactive commission adjustments to Mr. Santana for the period during which the discriminatory practice was in effect, and modify its timekeeping and pay practices to record and compensate all FLSA-covered pre-shift work;

g.    Reasonable attorney's fees and costs under 42 U.S.C. § 1988, 29 U.S.C. § 216(b), and Fla. Stat. § 760.11(5); and

h.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 21, 2026.

Respectfully submitted,

By: /s/ Peter Michael Hoogerwoerd
    Peter Michael Hoogerwoerd, Esq.
    Florida Bar No. 188239
    pmh@rgph.law

    REMER,  GEORGES-PIERRE  &
    HOOGERWOERD, PLLC
    2745 Ponce de Leon Blvd.
    Coral Gables, Florida 33134
    Telephone: (305) 416-5000